# Exhibit A-6

Case: 1:16-cv-08653 Document #: 2-7 Filed: 09/02/16 Page 2 of 4 PageID #:135

# Sunday

# Chicago Sun-Times

$1.25
Chicago/Suburbs
$1.50 Elsewhere

Pages 2, 79     JULY 19, 1992     3★ Final ★



Wrapping Up

# 3 Teens Say Police Used Shock Torture

## 13-Yr.-Old S. Sider Charges Confession Was Coerced

By Deborah Nelson
Staff Writer

©1992 Chicago Sun-Times

Police grabbed Marc last September as he waited for his mother under the Ten Commandments billboard at 51st and Ashland.

It was minutes after a gang-related shooting in the South Side neighborhood left one man mortally wounded.

Twenty-four hours later, the 13-year-old faced murder charges after signing a statement that allegedly made him an accomplice to the crime.

The detectives who questioned him say he gave the statement voluntarily.

Marc says they hooked him up to a box that sent jolts of electricity through his body.

"He said it looked like a cable box with some black wires," said his mother, who was barred from the interrogation. "They were shocking him with the black wires."

Marc is not alone in making the torture allegations, which are detailed by his attorney in motions pending in the Cook County Juvenile Court. At least two other boys questioned in the shooting told friends, parents and a probation
Turn to Page 26



EXHIBIT 6

Appendix B

## THE INTERRO...

# Torture

Continued from Page 1

officer they were shocked.

"It didn't happen," said Detective Michael Kill, who participated in the questioning. "They're trying to get someone who committed murder off the hook.

"This is not Nazi Germany 1933, where you torture people."

This is apparently the first time the Police Department has been publicly accused of using torture tactics on juvenile suspects.

A recently released city internal report found "systematic" brutality, electrical shocking and torture of adult suspects by a handful of detectives during the 1970s and 1980s. The FBI and the city's Police Board are conducting separate inquiries into similar allegations.

A key figure in all these investigations is Lt. Jon Burge, now on suspension pending outcome of the city's inquiry. Burge was the commanding officer of the violent crimes detectives who investigated the shooting in Marc's case.

Julie Hull

But Burge was not involved in the questioning and knew nothing about the case, his attorney said.

Police spokeswoman Tina Vicini said top department officials were unaware of the torture allegations raised in Marc's case until informed by the Sun-Times. The Internal Affairs Division has now begun an investigation, she said.

Assistant Public Defender Julie Hull, who is representing Marc, said the torture allegations were not surprising.

"Because a few detectives got away with doing this to adults for so long without being stopped, it was only a matter of time before they would do it to a child," she said.

Hull and prosecutors would not discuss the specifics of the case. A hearing on a motion to suppress Marc's statement is set for later this month.

The torture issue aside, police records and interviews show detectives apparently violated state law and department rules for handling minors in Marc's case.



SUN-TIMES/John H. White

Marc arrived at the Area 3 police station, at 39th Street and California, on Sept. 25. Twenty-four hours later, he faced murder charges, after signing a statement that allegedly made him an accomplice to a crime.

They sent his mother home rather than let her stay with Marc during questioning. They did not have a youth officer present during questioning, and they held him at the station well beyond the six-hour limit for minors.

The rules were put in place to protect juvenile rights and to ensure that legitimate confessions survive legal challenges. The stakes in those challenges are much higher as violent crimes by juveniles have reached record levels.

Confessions are routinely challenged, often because minors say they were mentally or physically coerced.

A torture charge, however, is rare, if not unprecedented.

"It's not done, because it's against the law. It's not done, because it's immoral," Kill said. "The means are not justified by the ends. It'd put you in the same classification as the idiot who committed the murder."

In the shooting case, it is the words of Kill and other detectives against the words of the young men they brought in for questioning, most of them admitted gang members with delinquency records.

Under investigation was an ugly gang shooting. Alfredo Hernandez was gunned down in front of his parents' home on the 5100 block of South Justine at 9:15 p.m. on Sept. 25. The next day, he died.

Within hours of the shooting, police had rounded up a crowd from the neighborhood they said had witnessed or participated in the crime.

Marc was the youngest. He had no delinquency record, but sometimes hung around with the older gangbangers from the neighborhood.

According to police records and court transcripts, Marc arrived at

the Area 3 station sometime after 9:30 p.m. Sept. 25 and stayed until 10:30 p.m. Sept. 26. During intermittent questioning through the night and early morning, police say he provided several versions of what happened.

In early statements, he was a bystander who heard but did not see the shooting. But in the last version—after the alleged shocking—he was an eyewitness who saw reputed gangbanger Jesse Clemons shoot the victim twice.

Marc signed an official statement in front of a prosecutor and youth officer on Sept. 26 that said he willingly talked and police treated him well.

According to the statement, Marc was hanging out on a street corner with Clemons and four other older boys when they saw the victim's car go by. Clemons grabbed a gun, and they chased the car on foot. (Marc's statement is not clear about whether he joined the chase.) Clemons shot Hernandez twice, while he stood in the street working on his car, the statement said.

The statement identified two defendants who had not been picked out of the lineup, including Clemons. But Marc now was more than a witness. He admitted to being a participant, the state's attorney's office said. He was eventually taken to the Juvenile Temporary Detention Center on a juvenile charge of murder.

Clemons, 19, his 16-year-old brother and three other older juveniles were charged as adults.

Marc was released a month lat- Turn to Page 27

## Torture
Continued from Page 26

er, after a judge decided the state's case was too weak to warrant detaining him until trial. Juvenile Court Judge Robert Barish, calling the prosecution's case the worst he had ever seen, said they did not prove Marc was anything but a bystander during the shooting.

He had a private attorney then, Daniel Franks, who said Marc told him about being shocked and hit. Before he could raise the issue in court, the family switched to a public defender, he said.

Marc's mother said he told her detectives put paddles on his hands attached by wires to a box. "He said when they did that, he'd tell them anything. He was crying and stuttering. I said 'don't worry, they're going to get theirs.'"

Meanwhile, in the days after the shooting, a probation officer ran into a client in court on an unrelated case. She noticed he looked shaken and asked what was wrong. He told her police had shocked him on the hands while holding him for questioning on the shooting case. Unlike Marc, he had not been charged.

Hull, Marc's lawyer, subsequently interviewed the boy. Court records say he told her: "The detective had a black object in his hand that 'looked like a flashlight' but when touched to his hands shocked him. After being shocked by the black device, [his] hands were 'frozen' and he couldn't move them. He cried and again reiterated his lack of knowledge about the shooting."

The boy now is serving time for an unrelated crime.

Another teenager at the station that night told the Sun-Times he saw an unusual looking "flashlight." He, too, was among the gang members who had been picked up for questioning about the shooting but not charged.

He said he saw police take the flashlight device into an interview room that held Clemons' 16-year-old brother.

"It didn't look like a police flashlight. I didn't know what it was," he said. "Then I heard hollering. When police came out, they left the door open a little. I asked what happened. He told me police were shocking him."

The device they described could be a stun gun, which uses an electric jolt to paralyze muscles temporarily, said Dr. Robert Kirschner, deputy chief medical examiner for Cook County and an internationally recognized torture expert. Kirschner testified on behalf of earlier electric shock victims in Chicago and will testify for Marc.

The Chicago Police Department bans the use of stun guns. Kill said he never saw a stun gun at Area 3 headquarters. He said the device Marc described sounded like a defibrillator, used to revive heart attack victims.

"That's the only thing I can figure," he said. "But it's impossible to do what they claim it did under the circumstances. It doesn't work that way." It could not be altered to shock him that way, Kill said.

"The allegations are completely fabricated," he said.

Marc is the only one of the six defendants to raise the electric shock issue in court. The other five are awaiting trial together in adult court. Two have filed motions to suppress their statements on more typical charges: that police used physical coercion. A third said he plans to do so.

Marc has been examined by Dr. Antonio Martinez, the coordinator of the Marjorie Kovler Center for the Treatment of Survivors of Torture in Chicago.

"I'm convinced this shocking happened to this kid," said Martinez, who also will be a defense witness.

Marc recalls the shooting without showing extraordinary stress but curls into a fetal position when discussing the questioning, Martinez said. The teen shakes at the sight of police and has nightmares a big man is chasing him, he said.

"He doesn't communicate with me anymore," his mother said. "He just sits back like he's in a world of his own."

Area 3 Detective John Smith, who was not involved in the questioning, discounted the torture allegations as a fabrication inspired by Burge's notoriety.

"Burge comes and suddenly we start hearing about electroshock," he said.



Chicago Sun-Times
7/19/92

